UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT J. KEATON,

     Applicant,

v.                               CASE NO. 8:21-cv-1257-SDM-UAM

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

     Keaton applies under 28 U.S.C. § 2254 for a writ of habeas corpus (Doc. 1)

and challenges his convictions for robbery with a firearm, aggravated battery on

a law enforcement officer, and fleeing and eluding, for which Keaton is imprisoned

for life.  Numerous exhibits (Docs. 19-2, 19-3, and 19-4) support the response.

(Doc. 19)  The respondent concedes the application's timeliness (Doc. 19 at 4–5) but

argues that some grounds are procedurally barred.  (Doc. 19 at 6–7)

## **I.  BACKGROUND**[1]

     On November 2, 2009, a male, who wore a navy jacket, black pants, a black

shirt over his face, and white socks on his hands, walked into Cash America Pawn in

St. Petersburg, Florida; pointed a black revolver at the employees; and demanded

money.  The armed male stole $4,000.00 from several registers and a safe.

---

[1] This summary of the facts derives from the briefs on direct appeal. (Doc. 19-4 at 6–29, 57–66).

Case 8:21-cv-01257-SDM-UAM   Document 30   Filed 09/23/24   Page 2 of 68 PageID 5451

Surveillance video showed that the armed male drove away in a gold Honda Accord with a dent in the rear bumper.

On December 23, 2009, the armed male returned to the pawn shop and stole more cash. After the second robbery, the manager at the pawn shop hid a tracking device in a stack of money in the safe. On February 25, 2010, the armed male returned to the pawn shop wearing the same clothes and gloves on his hands and stole $3,000.00 from the registers and the safe. The manager gave to the armed male the stack of money with the hidden tracking device. The armed male hit the manager on her head with the gun because a drawer on the safe did not open. Surveillance video showed that the armed male drove away in the same gold Honda Accord with a dent in the rear bumper.

The employees of the pawn shop observed the armed male's eyes through holes in the shirt that covered his face and described his eyes as "droopy" or "slanted." At trial, the employees identified Keaton as the armed male because Keaton's height, weight, and eyes matched the armed male's height, weight, and "droopy" eyes. After the third robbery, a police officer determined that the armed male drove with the tracking device to an apartment complex. The officer observed the same gold Honda Accord with a dent in the rear bumper parked in front of an apartment, found a bag of black clothes, a revolver, and ammunition inside the car, and found the tracking device and a pile of money on the floor inside the apartment.

A confidential informant observed Keaton park the gold Honda Accord in front of the apartment and leave in a green Dodge truck. Keaton deliberately

crashed the truck into a police car because the police car blocked the truck from exiting the apartment complex.  When Keaton backed up the truck and began to accelerate toward the police car again, another officer crashed into and pushed the truck away.  Keaton attempted to flee by swimming into a lake.  After a standoff that lasted an hour, police arrested Keaton.

After waiving his *Miranda*[2] rights, Keaton spoke with a detective and denied that he robbed the pawn shop.  After a sergeant spoke with Keaton for five minutes, Keaton confessed that he committed the third robbery, stole money from the pawn shop's registers and safe, and hit an employee on the head with a gun.  However, Keaton denied that he committed the first and second robberies.  After the sergeant spoke with Keaton a second time, Keaton confessed that he committed the first and second robberies.

During the defense's case, Keaton's girlfriend testified that she owned the Honda Accord parked in front of the apartment and lived at the apartment.  She admitted that, on the day of the third robbery, she lent Keaton her car but denied that Keaton and her car appeared in surveillance video from the pawn shop.  She testified that police threatened to arrest her if she did not consent to a search of her apartment and threatened to seize her car if she did not consent to a search of the car.

Keaton, a three-time convicted felon, testified that, on February 25, 2010, the day of the third robbery, a coworker named Justin, also called "Down South,"

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

borrowed the Honda Accord.  Later that day, Justin returned the Honda Accord, ran into the apartment, dropped money on the floor, ran back outside, and told Keaton that "the boys were after him."  When Keaton saw police arrive at the apartment complex, he became scared and drove away in his truck.  Keaton denied deliberately crashing into the police car and claimed that he tried to swerve around the police car and accidentally bumped into the car.  Keaton jumped into the lake because a police dog tried to bite him.

Keaton claimed that, during the interrogation, he denied committing the robberies at the pawn shop and denied owning a firearm.  He told the detective about Justin but did not know Justin's last name.  After the detective told Keaton that he did not believe Keaton, Keaton invoked his right to remain silent and asked to speak with an attorney.

## II.  <u>EXHAUSTION AND PROCEDURAL DEFAULT</u>

The respondent argues that ground two and ground three in the application are procedurally barred from federal review because Keaton failed to exhaust the claims.  (Doc. 18 at 6–7)  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that

court to the federal nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004)

(citing *Henry*, 513 U.S. at 365–66).

**Ground Two:**

Keaton asserts that trial counsel deficiently performed by not adequately

questioning Juror W. during jury selection and by not exercising a challenge against

Juror W.  (Doc. 8 at 13–17)  Keaton contends that Juror W.'s comments during jury

selection demonstrated that he would not act fairly and impartially as a juror.

(Doc. 8 at 14–16)  Keaton contends that he raised this claim in claim six and claim

twelve of his post-conviction motion.

In claim six of his post-conviction motion, Keaton asserted that trial counsel

deficiently performed by not moving for a mistrial after Juror W. and another

potential juror stated that they presumed Keaton guilty.  (Doc. 19-4 at 153)

In his federal application, Keaton asserts that trial counsel deficiently performed by

not adequately examining Juror W. and by not exercising a challenge against Juror

W.  (Doc. 8 at 13–17)  Consequently, the legal basis for each claim substantially

differs.  In claim twelve, Keaton asserted that trial counsel deficiently performed by

not exercising a challenge against Juror W.  (Doc. 19-4 at 176–78)  Keaton alleged

that during jury selection trial counsel asked whether a potential juror believed that

Keaton was guilty and that Juror W. responded, "all these charges, [Keaton] must be

guilty of something."  (Doc. 19-4 at 176–77)  In his federal application, Keaton

alleges that trial counsel asked how the potential jurors would react if they saw

a person detained by a police officer and that Juror W. responded that "he would

automatically assume the person was speeding or breaking the law." (Doc. 8 at 14)
Keaton further alleged that Juror W. stated that at trial he would find a police officer
who testifies more credible than a witness who is not a police officer. (Doc. 8
at 14–15) Consequently, the factual basis for each claim substantially differs.

Because Keaton failed to present in state court both the factual and legal bases
for his claim, ground two is unexhausted. *McNair v. Campbell*, 416 F.3d 1291, 1302
(11th Cir. 2005) ("While we do not require a verbatim restatement of the claims
brought in state court, we do require that a petitioner presented his claims to the state
court 'such that a reasonable reader would understand each claim's particular legal
basis and specific factual foundation.'") (quoting *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d
1317, 1344–45 (11th Cir. 2004)).

**Ground Three:**

Keaton asserts that trial counsel deficiently performed by not objecting to the
prosecutor's failure to disclose the identity of a suspect whom a police officer arrested
at the apartment complex. (Doc. 8 at 19–21) Keaton further asserts that trial
counsel deficiently performed by not investigating the suspect. (Doc. 8 at 19)
Keaton contends that he raised this claim as claim five in his post-conviction motion.
(Doc. 8 at 19)

In claim five of his post-conviction motion, Keaton asserted that the
prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing the
identity of the suspect whom the officer arrested. (Doc. 19-4 at 166–68, 151–52)
In his federal application, Keaton asserts that trial counsel deficiently performed by

not objecting to the prosecutor's failure to disclose the identity of the suspect and by not investigating the suspect. (Doc. 8 at 19–21) Even though his federal application cites *Brady* (Docs. 8 at 19 and 9 at 23), Keaton raises an ineffective assistance of counsel claim. Because retained counsel drafted Keaton's federal application, the application is not generously construed. *Haines v. Kerner*, 404 U.S. 519, 595–96 (1972). Because the legal basis for each claim substantially differs, Keaton failed to exhaust the claim in his federal application. *McNair*, 416 F.3d at 1302. Consequently, ground three is unexhausted.

Keaton neither demonstrates cause and prejudice to excuse the procedural default nor shows that the "fundamental miscarriage of justice" exception applies. (Doc. 23 at 11–14) Because Keaton proffers no specific facts showing an exception to the procedural default, ground two and ground three are procedurally barred from federal review.

## III. <u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding. *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998). Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> resulted in a decision that was based on an
> unreasonable determination of the facts in light
> of the evidence presented in the State court
> proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of
> a federal habeas court to grant a state prisoner's application for
> a writ of habeas corpus with respect to claims adjudicated on
> the merits in state court. . . . Under the "contrary to" clause,
> a federal habeas court may grant the writ if the state court
> arrives at a conclusion opposite to that reached by this Court on
> a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable
> facts. Under the "unreasonable application" clause, a federal
> habeas court may grant the writ if the state court identifies the
> correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's
> case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]'") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. A respondent may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 584 U.S. at 125–26.

In *per curiam* decisions without a written opinion the state appellate court affirmed the denial of Keaton's federal claims on direct appeal and the denial of his Rule 3.850 motion. (Doc. 19-4 at 107, 1171) A state appellate court's *per curiam*

decision without a written opinion warrants deference under Section 2254(d)(1). *Wright v. Sec'y, Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002). *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Keaton bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001). Keaton's federal application presents the same grounds that he presented to the state court. The state court's rejection of Keaton's claims warrants deference in this federal action. (Doc. 19-4 at 107, 1171)

# IV.  ISSUES ON DIRECT APPEAL

## Ground Six, Subpart A:

Keaton asserts that the trial judge violated his federal rights by overruling objections to two questions by the prosecutor during the cross-examination of Keaton and by overruling an objection to a comment by the prosecutor during closing.  (Doc. 8 at 37–39)  Keaton contends that the prosecutor's questions and comment impermissibly shifted the burden of proof and infringed Keaton's federal right to remain silent.  (Doc. 8 at 37–39)

### Shifting the Burden of Proof

Keaton asserts that the trial judge violated his federal rights by overruling the following objections to two questions by the prosecutor during the cross-examination of Keaton (Doc. 19-3 at 1238–40):

| | |
|---|---|
| [Prosecutor:] | You had to sign up [at Able Body], right? |
| [Keaton:] | Yes, sir. |
| [Prosecutor:] | And Justin would have had to sign up there, right? |
| [Keaton:] | Yes, sir. |
| [Prosecutor:] | And you know where the business is, right? |
| [Keaton:] | Yes, sir. |
| [Prosecutor:] | You didn't subpoena any records, you know, from that business, did you? |
| [Keaton:] | No, I didn't. I was *pro se* at the time. |
| [Prosecutor:] | Yeah, you were *pro se* at the time. You were representing yourself. You knew |

how to get documents from the Pinellas County DNA lab. You knew how to get documents from the Saint Petersburg Police Department on your own. You knew how to file documents to get additional discovery from me here in this courtroom. And you didn't even ask the court to subpoena the records from that business, did you?

[Trial counsel:]     Your Honor, I'm going to object. May we approach?

[Trial court:]       Approach.

. . .

[Trial counsel:]     I think this line of questioning is going towards him having to prove something. It's the State's burden to prove that he did it, not that he's innocent. It's not his job to prove he's innocent.

[Trial court:]       Okay. Response?

[Prosecutor:]        Judge, I think it's fair inquiry if there is information available to him and he has resources to get them, and he chose not to do it.

[Trial court:]       Okay. I'm going to have you move on. Thank you.

. . .

[Prosecutor:]        And you've dealt personally with me. We've sat down at the table and had conversations, right?

[Keaton:]            Yes, we have. And how did I conduct myself?

[Prosecutor:]        You were always polite.

[Trial court:]       Sir, excuse me. You're not there to ask questions.

| | |
|---|---|
| [Keaton:] | Yes, Your Honor. |
| [Trial court:] | You're here to answer them. |
| [Keaton:] | Yes, sir. |
| [Prosecutor:] | And I was polite to you. |
| [Keaton:] | Yes, sir. |
| [Prosecutor:] | And you never said, Mr. Ripplinger, would you subpoena — |
| [Trial counsel:] | Objection, Your Honor. |
| [Trial court:] | I said move on. |

During closing, the prosecutor mentioned Keaton's failure to produce the records (Doc. 19-3 at 1312–13):

> [Prosecutor:]    The police officers. I asked [Keaton] about, you know, he had all the police reports. I asked him, you know, in the last two years has there been any documentation anywhere about Deep South, Justin, or Able Body? No, nothing. Nothing until two years this afternoon. They can't go out. They probably don't even have records anymore. If that guy worked there, the police could have [gone] right out there that day and said, "Who was working that day? Who are you sending out to jobs? Okay. Let me track it down. Is there anybody named Justin? Is there some guy you call Deep South?"
>
> Supposedly, the police are lying about that. Well, why lie about something that would be so easy to go back and, you know, establish, you know, that they were there at that place that day and that there was somebody named Justin working there that day? Pretty easy to go and check up on. You know, he [sat] on that conveniently for two years.

| [Trial counsel:] | Objection, Your Honor. |
|---|---|
| [Trial court:] | Overruled. |
| [Prosecutor:] | The judge is going to instruct you that you can rely on your own conclusion about any witness, even a defendant who chooses to take the stand. Once he takes the stand, you have that ability to rely on your own conclusion. You can believe all of what a witness says. You can just believe part of what a witness says, any witness, including the defendant. |

"'[T]he State may not elicit testimony at trial that could lead the jury to the erroneous conclusion that the defendant has a duty to produce exculpatory evidence to refute an element of the charged crime.'" *Granados v. State*, 199 So. 3d 384, 389 (Fla. 4th DCA 2016) (quoting *Warmington v. State*, 149 So. 3d 648, 654 (Fla. 2014)). "[A] narrow exception [applies] when the defendant voluntarily assumes some burden of proof by asserting the defenses of alibi, self-defense, and defense of others, relying on facts that could be elicited only from a witness who is not equally available to the State." *Jackson v. State*, 575 So. 2d 181, 188 (Fla. 1991).

At trial, Keaton testified that, on the day of the third robbery, he lent his girlfriend's car to a male named Justin, also called "Down South." (Doc. 19-3 at 1209–11) He testified that he worked with Justin at a staffing agency called Able Body. (Doc. 19-3 at 1207–09) He testified that later that day, when police arrived at his girlfriend's apartment, Justin returned his girlfriend's car, threw money on the floor of the apartment, and fled from police. (Doc. 19-3 at 1211–12) Keaton did not assert an affirmative defense of alibi, self-defense, or defense of others. *Jackson*, 575 So. 2d at 188.

Even if the trial judge violated Keaton's federal right to due process by overruling the objections to the questions by the prosecutor on cross-examination, Keaton fails to demonstrate actual prejudice. *Al-Amin v. Warden, Ga. Dep't Corrs.*, 932 F.3d 1291, 1299–1300 (11th Cir. 2019) (citing *Davis v. Ayala*, 576 U.S. 257, 267 (2015)). "[Actual prejudice] requires 'more than a reasonable probability that the error was harmful.'" *Al-Amin*, 932 F.3d at 1300 (quoting *Davis*, 576 U.S. at 268). "[T]he standard for determining whether habeas relief must be granted is whether the [ ] error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "To determine whether a trial error was harmless, [a federal habeas court] typically consider[s] the magnitude of the error, the effect of any curative instruction, and whether the prosecution otherwise presented overwhelming evidence of guilt to the jury." *Al-Amin*, 932 F.3d at 1300.

The two questions by the prosecutor during the cross-examination of Keaton were brief and isolated, and after both questions the trial judge instructed the prosecutor to "move on." (Doc. 19-3 at 1238–40)  During closing, the prosecutor did not argue that Keaton failed to prove his innocence and instead explained why police were unable to investigate Keaton's claim that Justin committed the robberies. (Doc. 19-3 at 1312–13)  Also, both the prosecutor and trial counsel reminded the jury of the prosecutor's burden of proof.  (Doc. 19-3 at 1270, 1284, 1309–10)

Before trial, the trial judge instructed the jury on the prosecutor's burden of proof (Doc. 19-3 at 502–06):

[Trial court:]          You've already met the prosecutors. Remember this: It is the prosecution that has the exclusive burden of proof. By inserting that word "exclusive," this is what I mean: The burden of proof never shifts over to the defense. The burden of proof is with the prosecution. There's no burden of proof at the defense table.

                              Remember, Mr. Keaton is presumed innocent. They don't have to call witnesses. They don't have to present evidence. Mr. Keaton himself is not required to be a witness because the burden of proof stays at the prosecution's table.

                              . . .

                              In every criminal proceeding — let me repeat that. In every criminal proceeding, a defendant has an absolute right to remain silent. At no time is it the duty of a defendant to prove his innocence. From the exercise of a defendant's right to remain silent, a jury is not permitted to draw any inference of guilt whatsoever. The fact that a defendant did not take the witness stand must not influence your verdict in any manner.

After closing arguments, the trial judge repeated to the jury that the prosecutor had the burden of proof (Doc. 19-3 at 1415–16):

[Trial court:]          The defendant has entered a plea of not guilty. This means you must presume or believe the defendant is innocent. The presumption stays with the defendant as to each material allegation in that charging document, the felony information, through each stage of the trial unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt.

> To overcome the defendant's presumption of innocence, the State has the burden of proving [that] the crime with which the defendant is charged was committed and [that] the defendant is the person who committed the crime. The defendant is not required to present evidence or to prove anything.

Before deliberations, the trial judge gave the jurors a written copy of the instructions. (Doc. 19-3 at 1429)  "'[A court] presum[es] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.'"  *United States v. Olano*, 507 U.S. 725, 740 (1993) (citation omitted).

Also, the evidence at trial convincingly proved that Keaton robbed the pawn shop.  A masked male wearing black clothes entered the pawn shop three times, pointed a revolver at the employees of the pawn shop, and demanded money. Surveillance video showed that after each robbery the masked male drove away in a gold Honda Accord with a dent in the rear bumper.  (Doc. 19-3 at 41–42, 100–06, 152–55)  The employees identified Keaton as the masked male because Keaton's height, weight, and eyes matched the masked male's height, weight, and "droopy" eyes.  (Doc. 19-3 at 752–53, 764, 793–94, 809)  A police officer determined after the third robbery that the masked male drove with a tracking device hidden in a stack of money to an apartment complex.  (Doc. 19-3 at 866–67)  The officer observed the gold Honda Accord with the dent in the rear bumper parked in front of an apartment, found a bag of black clothes, a revolver, and ammunition inside the car,

and found the tracking device and a pile of money on the floor inside the apartment. (Doc. 19-3 at 189–94, 204–33, 867, 883–93 and 29 at 21–26)

The gold Honda Accord and the apartment belonged to Keaton's girlfriend. (Doc. 19-3 at 909–14, 1173)  On the day of the third robbery, Keaton's girlfriend lent the car to Keaton.  (Doc. 19-3 at 1174)  When police arrived at the apartment complex, Keaton deliberately drove his truck into a police car that blocked the exit. (Doc. 19-3 at 949–51 and 29 at 60–64)  Keaton attempted to flee from police by swimming into a lake.  (Doc. 19-3 at 951, 956–59)  After waiving his *Miranda* rights, Keaton confessed that he committed the three robberies.  (Doc. 19-3 at 990–92)

 Keaton claimed that on the day of the third robbery he lent the gold Honda Accord to a male named Justin, also called "Down South."  (Doc. 19-3 at 1209–11) He testified that later that day, when police arrived at his girlfriend's apartment, Justin returned his girlfriend's car, threw money on the floor of her apartment, and fled from police.  (Doc. 19-3 at 1211–12)  He denied that he confessed to police and claimed that he told a detective about Justin but did not know Justin's last name. (Doc. 19-3 at 1219–23)  A detective testified that, during the interrogation, Keaton never mentioned Justin.  (Doc. 19-3 at 1249–50)

Only self-serving testimony by Keaton, a three-time convicted felon (Doc. 19-3 at 1211), supported the claim that a male named Justin committed the crimes. Keaton could not remember whether on the day of the first and second robberies he lent his girlfriend's car to Justin.  (Doc. 19-3 at 1240)  The prosecutor introduced photographs from a surveillance camera that showed the suspect's eyes (Doc. 19-3 at

92–93, 98–99, 149), and the jury could independently determine whether Keaton's eyes matched the suspect's eyes.  Keaton's flight immediately after police discovered the gold Honda Accord at his girlfriend's apartment demonstrated consciousness of guilt. *Cruz v. State*, 320 So. 3d 695, 714 (Fla. 2021) ("Evidence that a suspect 'in any manner attempts to evade prosecution after a crime has been committed' is admissible and relevant to the consciousness of guilt.") (citation omitted).

Because Keaton failed to demonstrate that the prosecutor's two brief and isolated questions substantially and injuriously affected the jury's verdict, the state court did not unreasonably deny the claim.  *Al-Amin*, 932 F.3d at 1301–02 ("Given both the overwhelming evidence against Al-Amin — including physical evidence and eyewitness testimony — and the difficulty in tracing the error to the verdict in his case, we conclude that Al-Amin did not suffer actual prejudice from the error.").

**Right to Remain Silent**

During closing, the prosecutor argued that Keaton's failure to mention to police that he lent his girlfriend's car to Justin prevented police from investigating the claim.  (Doc. 19-3 at 1312–13)  The prosecutor argued that Keaton instead "[sat] on [his claim] conveniently for two years."  (Doc. 19-3 at 1313)  Because Keaton spoke with a detective after waiving his *Miranda* rights and testified at trial, the trial judge did not violate Keaton's federal right to remain silent by overruling the objection. *United States v. Dodd*, 111 F.3d 867, 869 (11th Cir. 1997) (quoting *Anderson v. Charles*, 447 U.S. 404, 408 (1980)).  Ground Six, subpart A is denied.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

Keaton claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged

conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Keaton must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.  To meet this burden, Keaton must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Keaton cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful.  *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105.  *Nance*, 922 F.3d at 1303 ("Given the double deference due,

it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

Because the state court rejected the grounds based on *Strickland*, Keaton cannot meet the "contrary to" test in Section 2254(d)(1). (Doc. 19-4 at 188–208, 721–46) Keaton instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact. In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable. *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A. Grounds of IAC Before and During Trial

### Ground One:

Keaton asserts that trial counsel deficiently performed by not objecting when Juror M. began to sleep during trial. (Doc. 8 at 9–12) The post-conviction court denied the claim as follows (Doc. 19-4 at 725–28) (state court record citations omitted):

> Defendant[ ] alleges that counsel was ineffective for failing to object during the reading of the jury instructions. Defendant alleges that while the court was reading the instructions, he noticed that a juror had fallen into a deep sleep, "thus distracting the jurors next to him," and immediately notified counsel, who "shrugged it off." Defendant

asserts that the bailiff also noticed the sleeping juror and notified the court, who "called out to [Juror M.] several times to wake up, all to no avail," until the sleeping juror was eventually woken up by another juror. He asserts that the court admonished the juror not to go to sleep again. Defendant alleges that he advised counsel that he did not want the juror to remain on the panel to no avail, and was afraid to interrupt the trial and risk[ ] being removed. Defendant alleges he was prejudiced because the court never inquired as to how long the juror had been asleep to determine what parts of the jury instructions he had missed, which allowed him to enter deliberations without confirming if he knew how to apply the law to the facts of the case. Defendant asserts that but for counsel's deficiency, there is a reasonable probability that the outcome of the trial would have been different. The State was directed to respond.

In its response, the State asserts that, contrary to Defendant's claim, the record does not show that the court repeatedly called out to [Juror M.] to wake up. Instead, the State asserts that the court's interaction with [Juror M.] was so limited that it is unapparent whether [Juror M.] was even asleep, or if he was simply being inattentive. Notwithstanding, the State asserts that Defendant has not alleged, and the record does not reflect, that [Juror M.] was asleep during any substantive testimony, and even if counsel had objected under these circumstances, the court would not have been obligated to dismiss the juror solely for sleeping during closing arguments. *See Bullis v. State*, 734 So. 2d 463, 464 (Fla. 5th DCA 1999). The State further alleges that Defendant cannot establish prejudice, because he does not allege that the juror was asleep during the presentation of substantive evidence, such as witness testimony, or for substantial portions of the trial. *See Thompson v. State*, 873 So. 2d 481 (Fla. 2d DCA 2004); *Kelley v. State*, 805 So. 2d 88 (Fla. 2d DCA 2002); *Collins v. State*, 200 So. 3d 163, 166 (Fla. 5th DCA 2016); *Virgo v. State*, 120 So. 3d 23, 25 (Fla. 4th DCA 2013); *Erlsten v. State*, 842 So. 2d 967, 968 (Fla. 4th DCA 2003); *Wilson v. State*, 828 So. 2d 1086, 1086–87 (Fla. 1st DCA 2002). The State asserts that jury instructions are not substantive evidence, and the jurors were provided a written copy of the instructions to take to the jury room for deliberations. The State therefore argues that even if [Juror M.] did nod off for a moment while the jury instructions were being read, a juror's brief lack of focus during a non-evidentiary portion of the trial falls short of the threshold necessary to undermine the court's confidence in the outcome of the trial.

This court agrees. First, Defendant's version of the events involving [Juror M.] during the reading of the jury instructions is refuted by the record. Although Defendant emphasizes in his motion that the court "called out to [Juror M.] several times to wake up," that [Juror M.] was allegedly "so sound asleep that he never made the slightest acknowledgement to the trial judge's summons," and that the court "admonished [Juror M.] in front of the other jurors not to go to sleep again," the record reflects that during the entire reading of the jury instructions, the court never once mentioned [Juror M.] by name, nor did the court call out to any juror multiple times to wake up or admonish any jurors not to go to sleep as Defendant claims. Instead, the only interaction the court had with [Juror M.] during the reading of the jury instructions is as follows:

| | |
|---|---|
| [Trial court:] | Hello. You know, I know that you're [going to] have a chance to read the law, but it is important that you follow the law as I'm reading it. Okay? Juror Two? |
| [Juror M:] | Yes, sir. Problem corrected. |
| [Trial court:] | I know that it's repetitive, but as a matter of law, I have to instruct. |
| [Juror M.:] | Sorry. |

As the State points out in its response, it is unclear from this limited interaction whether [Juror M.] was even asleep, or just being inattentive to the court's instructions. Defendant does not allege that [Juror M.] was sleeping during witness testimony or [the] presentation of the evidence, only that the juror slept through a portion of the reading of the jury instructions. Thus, even if counsel had objected or moved to replace [Juror M.], the Court would not have been obligated to sustain or grant the motion. *See Bullis v. State*, 734 So. 2d 463, 464 (Fla. 5th DCA 1999) (finding no abuse of discretion when the trial court declined to discharge a juror who was observed sleeping during a portion of the trial, noting that "there is no indication that the juror slept through any testimony, only closing arguments."). Accordingly, Defendant has failed to demonstrate that counsel was deficient.

Furthermore, Defendant cannot demonstrate that the outcome of the trial would have been different but for counsel's failure to move to remove [Juror M.] Although appellate courts have found that sleeping juror claims typically warrant an

evidentiary hearing, the appellate opinions indicate that [ ] in those cases, the juror was allegedly asleep during the presentation of substantive evidence, such as witness testimony or the presentation of evidence. *See Thompson v. State*, 873 So. 2d 481 (Fla. 2d DCA 2004) (finding the defendant's claim to be legally sufficient where he alleged the juror slept during "critical testimony" and remanding for an evidentiary hearing to determine whether counsel was ineffective for failing to inform the trial judge that a juror was asleep during the presentation of evidence); *Kelley v. State*, 805 So. 2d 88 (Fla. 2d DCA 2002) (reversing summary denial of a post-conviction claim alleging that a juror "slept through substantial portions of the State's case"); *Collins v. State*, 200 So. 3d 163, 166 (Fla. 5th DCA 2016) (remanding for an evidentiary hearing where counsel allegedly failed to seek removal of juror who was asleep during the defendant's testimony); *Virgo v. State*, 120 So. 3d 23, 25 (Fla. 4th DCA 2013) (finding that an evidentiary hearing was required where the defendant alleged that counsel failed to seek removal of a sleeping juror who missed important testimony); *Erlsten v. State*, 842 So. 2d 967, 968 (Fla. 4th DCA 2003) (reversing summary denial of a post-conviction claim alleging that counsel failed to address a juror who was sleeping during most of the trial); *Wilson v. State*, 828 So. 2d 1086, 1086–87 (Fla. 1st DCA 2002) (finding the defendant's claim that counsel failed to notify the court that a juror slept through identification testimony and subsequent impeachment testimony to be facially sufficient, and remanding to determine whether [counsel] was ineffective for failing to notify the court that the juror was asleep during the presentation of evidence).

Unlike the above listed cases, which involved a sleeping juror who missed critical testimony, the presentation of evidence, or a substantial portion of the trial, Defendant alleges only that [Juror M.] slept through a portion of the jury instructions. Jury instructions are not substantive evidence. Moreover, the jurors were provided with written copies of the instructions to use during deliberations. Thus, even if [Juror M.] was asleep during a portion of the jury instructions, he would not have missed any substantive testimony or evidence, and had a written copy of the instructions available during deliberations. In light of the foregoing, Defendant fails to demonstrate that the outcome of the trial would have been different, but for counsel's alleged error. This claim is denied.

Whether an objection to a juror who slept during the final charge would succeed is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance — even when based on the failure of counsel to raise a state law claim — is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [ ] counsel failed to raise turns on state law.") (citation omitted).

In his post-conviction motion, Keaton alleged that Juror M. fell asleep during the final charge and did not respond when the trial judge repeatedly told him to wake up. (Doc. 19-4 at 150–51) He alleged that "Juror [M.] was in such a deep sleep and did not hear the [trial] judge calling him, it took for Juror [W.] to hit him on the right shoulder several times before he became conscious again." (Doc. 19-4 at 150)

However, the trial transcript demonstrates that, during the lengthy final charge, the trial judge admonished Juror M. once and that Juror M. immediately responded and promised to pay attention (Doc. 19-3 at 1386–87):

| [Trial court:] | If you find the defendant guilty of theft, you must also determine if the State has proved beyond a reasonable doubt whether the value of the property taken was three hundred dollars or more, but less than five thousand [dollars]. |
|---|---|
| | Hello. You know, I know that you're [going to] have a chance to read the law, but it is important that you follow the law as I'm reading it. Okay? Juror Two? |
| [Juror M.:] | Yes, sir. Problem corrected. |

| [Trial court:] | I know that it's repetitive, but as a matter of law, I have to instruct. |
|---|---|
| [Juror M.:] | Sorry. |

Because the trial transcript refuted Keaton's claim, the post-conviction court did not unreasonably deny the claim.  28 U.S.C. § 2254(d)(2).

     Also, even if an objection to the sleeping juror succeeded, the trial judge would not grant a mistrial.  The trial judge would either repeat the instruction that the juror did not hear or replace the juror with an alternate juror.  Fla. R. Crim. P. 3.280(a) ("Alternate jurors, in the order in which they are impanelled, shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties.").  *See Orosz v. State*, 389 So. 2d 1199, 1200 (Fla. 1st DCA 1980) ("The conduct of jurors is the responsibility of the court, and the court is allowed discretion in dealing with any problems that arise.").  Because Keaton failed to demonstrate a reasonable probability that the outcome at trial would change, the post-conviction court did not unreasonably deny the claim.  *Strickland*, 466 U.S. at 694.  Ground one is denied.

**Ground Four:**

     Keaton asserts that trial counsel deficiently performed during closing by neither objecting nor moving for a mistrial after the prosecutor wrapped his head in a shirt and pointed a gun at the jurors.  (Doc. 8 at 23–24)  The post-conviction court denied the claim as follows (Doc. 19-4 at 200–01) (state court record citations omitted):

Defendant[ ] alleges that counsel was ineffective for failing to object to and move for a mistrial when the State committed a golden rule violation. Defendant asserts that during his closing argument, Assistant State Attorney Ripplinger tied a T-shirt around his face to mimic the robber, and pointed the alleged firearm used in the robberies at the jury box. Defendant claims that "[i]n doing this, [the prosecutor] repeatedly waved the gun back and forth at the jurors while employing words in connection with the display clearly putting them in the shoes of the victims which is strictly prohibited." Defendant alleges that he was prejudiced because these actions instilled undue fear in the jurors' minds, which "hypothetically led jurors to convict Defendant due to the fact that it would be one less person in society who could instill this type of fear in someone" and because "no one wants a real gun pointed at them, whether it be loaded or unloaded." He alleges that, but for counsel's error, there is a reasonable probability that the outcome of the trial would have been different.

"'Golden rule' arguments are arguments that invite the jurors to place themselves in the victim's position during the crime and imagine the victim's suffering." *Mosley v. State*, 46 So. 3d 510, 520 (Fla. 2009) (emphasis added). The harmless error test is applied to consider the prejudicial effect of golden rule type arguments. *Dial v. State*, 922 So. 2d 1018 (Fla. 4th DCA 2006).

Defendant is not entitled to relief. The record reflects that Assistant State Attorney Ripplinger gave the State's rebuttal argument. First, contrary to Defendant's claim that Mr. Ripplinger "pointed the alleged firearm used in the robberies at the jury box," Mr. Ripplinger clearly stated during his closing argument that he had brought something to use as a demonstration, but stated "I'm not going to use the actual evidence." Thus, Defendant's claim is refuted by the record, as Mr. Ripplinger clearly stated that he was not using the alleged firearm that was admitted into evidence during his demonstration. In fact, based on Mr. Ripplinger's comments during the demonstration, specifically, that "[y]ou get this big ol' shirt, you know, that will go over things like you see in there . . .," it appears that Mr. Ripplinger was actually demonstrating how Defendant's mask was tied, as Mr. Ripplinger never even referenced a firearm during the demonstration. Second, Defendant does not point to, and Mr. Ripplinger's closing argument does not reflect, any specific statements inviting the jurors to place themselves in the victims' position during the crimes. *See Mosley*, 46 So. 3d at 520. In fact, the only reference Mr. Ripplinger made to the victims or the

> robberies themselves was to reference that the victims all
> testified regarding their identification of Defendant, and they
> remembered Defendant's eyes, and that Ms. Nero testified that
> she heard a gun. In light of the foregoing, Defendant has failed
> to demonstrate that a golden rule violation occurred. Therefore,
> counsel was not deficient because counsel had no basis to
> object, and counsel cannot be deemed ineffective for failing to
> raise a meritless objection. *Schoenwetter*, 46 So. 3d at 546.
> This claim is denied.

Whether an objection or a motion for a mistrial would succeed is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney*, 876 F.3d at 1295.

In his post-conviction motion, Keaton alleged that "during [ ] closing arguments, [the prosecutor] tied a T-shirt around his face so that only his eyes could be seen (mimicking the robber) and pointed the alleged firearm used in the robberies at the jury box." (Doc. 19-4 at 173) He further alleged that the prosecutor "repeatedly waved the gun back and forth at the jurors while employing words in connection with the display clearly putting them in the shoes of the victims, which is strictly prohibited." (Doc. 19-4 at 173)

During closing, the prosecutor summarized evidence related to the third robbery as follows (Doc. 19-3 at 1315–17):

> [Prosecutor:]     And then here's February. You got the
> wood. They got pictures of the car. There
> is the dent in the car. Is it, you know,
> reasonable to believe this is some big
> coincidence, that this Down South guy on
> three separate occasions gets this guy's
> girlfriend's car, comes in there with this,
> you know, you know, the same disguise
> every time? That's just bad luck for this
> guy. I mean, he has to be the most

unlucky man in the world to have this guy take advantage of him like that.

And each time, each time — I guess that, you know, his bad luck that for some reason he left what, you know, the police would call a robbery kit in the car for the guy to use. You know, we got some big jeans that can go over some other clothing. We got these T-shirts, short-sleeve T-shirts.

I brought something along to use as a demonstration. I'm not going to use the actual evidence. You know, if you're going to rob Cash America Pawn, what is the best way to do it? Works pretty good, don't it?

Look at the other pictures where you see all the stuff wadded up in the back. And we know what happened at least on the last one. He goes on for a while and he stops for a while. Why is he stopped there doing something? He's getting all this stuff off. It's convenient, too. You could stick your arms through there. Pretty slick. If you had to, you could do that. And then you have something else underneath. You get this big ol' shirt, you know, that will go over things like you see in there.

And then there is something, if you look kind of closely, State Exhibit 54 — actually, you can start with the video.

And I'll draw your attention to Exhibit 26, frayed jeans that were in the bag with those shirts. Look on his left leg there. Do you see the lines? Look at that. You see the little slant there? You can see the slant. His jeans, February 25th, right there with shirts that you can hide your face just like that, a big ol' long-sleeve shirt all together in the front passenger seat. Like I said, they stopped. If they were at Fairchild,

that's what he's doing, getting out of this
stuff.

The trial transcript demonstrates that the prosecutor used demonstrative evidence to show the jury how Keaton covered his face with a shirt. The prosecutor informed the jury that he brought "something" to "use as a demonstration" and that he was "not going to use the actual evidence." (Doc. 19-3 at 1316) Because the transcript refutes Keaton's contention that the prosecutor waved and pointed at the jury the actual firearm brandished during the robberies, the post-conviction court did not unreasonably deny the claim. 28 U.S.C. § 2254(d)(2).

Also, because the record demonstrates that the prosecutor used demonstrative evidence to show the jury how Keaton covered his face with a shirt and did not "invite the jurors to place themselves in the victim's position during the crime and imagine the victim's suffering," a motion for a mistrial would not succeed. *Jackson v. State*, 250 So. 3d 844, 848 (Fla. 3d DCA 2018) (quoting *Mosley v. State*, 46 So. 3d 510, 520 (Fla. 2009)). Because Keaton cannot demonstrate a reasonable probability that the outcome at trial would change, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694. Ground four is denied.

**Ground Five:**

Keaton asserts that trial counsel deficiently performed by neither objecting nor moving for a mistrial after the admission of testimony by Detective Anderson and Detective Cruz that allegedly violated his federal right to confrontation. (Doc. 8 at 26–30) The post-conviction court denied the claim as follows (Doc. 19-4 at 732–35) (state court record citations omitted):

Defendant[ ] alleges that counsel was ineffective for failing to object to hearsay and request a mistrial due to the State's violation of his right to confront and cross-examine his accuser. Defendant asserts that, at trial, the State elicited inadmissible testimony from police "that they received a call from a confidential informant who stated that he [or] she [had] seen Defendant get out of a gold vehicle and go into [an] apartment and come back out and get into a green truck." Defendant asserts that this information "was the lone reason for stopping [the] defendant." Defendant alleges that the confidential informant was not called as a witness, and counsel was ineffective for failing to object and move for a mistrial. Defendant alleges he was prejudiced because the jury improperly relied on inadmissible hearsay to link Defendant to the suspect's vehicle, "which in turn, connected him to the fleeing and the robbery of count three as well as the consciousness of guilt of the other robberies." Defendant also alleges he was prejudiced because the testimony discredited his own testimony that Justin "Down South" used the suspect's vehicle. Defendant asserts that there is a reasonable probability that but for counsel's ineffectiveness, the outcome of the trial would have been different, because if counsel had objected and moved for a mistrial, "the jury would not have found him guilty of being the suspect who used the suspect's vehicle and acquit him of the robberies and the fleeing offense." The State was directed to respond to this claim.

In its response, the State asserts that Defendant's claim should be denied, because he fails to demonstrate prejudice. The State avers that Defendant's claim that the confidential witness was the only person who could connect Defendant to the robberies is refuted by the record. The State argues that there was ample testimonial and physical evidence introduced at trial that implicated Defendant in the robberies, and therefore there is no reasonable probability that counsel's failure to object to the alleged hearsay affected the outcome of the trial.

This court agrees. Out-of-court statements from a confidential informant who does not testify is generally inadmissible hearsay. *See Alcantar v. State*, 987 So. 2d 822, 825 (Fla. 2d DCA 2008); *Haynes v. State*, 502 So. 2d 507, 508 (Fla. 1st DCA 1987). Detective Anderson testified that he responded to the apartment complex after the third robbery, where law enforcement had tracked a GPS device concealed in money taken from the Cash America Pawn. He testified that he received information from a confidential witness that someone driving a gold Honda Accord sped into the apartment complex,

parked in front of an apartment building, quickly ran in and then back out of the building, and got into a green Dodge Ram truck and headed toward the front gate. He testified that he shared that information with other officers, who eventually located Defendant in the truck near the gate of the apartment complex.

Defendant is not entitled to relief on this claim because there is no reasonable probability that the outcome of the trial would have been different even if counsel had objected to that testimony. Contrary to Defendant's allegation, the confidential witness was not the "lone reason" that law enforcement stopped Defendant, as there was overwhelming evidence implicating Defendant as the perpetrator of the robberies. As the State summarizes in its response, the testimony at trial established that the same Cash America Pawn store was robbed three times by a black male wearing dark clothing, with a T-shirt wrapped around his head showing only his eyes, and socks or gloves on his hands. During each robbery, the perpetrator propped the front door open with a piece of wood and fled in a gold [or] tan Honda car with a dented bumper. The robberies were recorded by the store's video surveillance system and played for the jury.

The testimony further established that after the second robbery, store management hid a GPS tracker with the money that was in the safe. The GPS tracker began transmitting a signal to law enforcement after the money was removed from the safe during the third robbery, and law enforcement pursued the signal, ultimately leading them to an apartment complex where they searched for the signal and the black male matching the suspect's description. At one point, police located the vehicle, a small, tan, four door car, and attempted to chase the suspect, but lost sight of the vehicle when it fled at high speeds. The GPS signal led police to the apartment complex, where they located a gold [or] tan Honda with a dented bumper registered to Defendant's girlfriend, Lashawnda Lee, parked outside an apartment building. The vehicle was still hot, and gloves and money could be seen in the car — a firearm and ammunition was also recovered from the vehicle. Ms. Lee testified that she had lent Defendant her car on the morning of the final robbery, and was at work when she received a call from police. She denied owning a firearm and testified that the keys she gave Defendant for the car also had a key to her apartment. The GPS tracking device was found inside of Ms. Lee's apartment, and $3,145.00 was recovered from the apartment.

When law enforcement attempted to block the apartment complex exit with their marked police vehicles, Defendant pulled up to the gate to leave in a green Dodge truck, and then rammed the police cruiser. Defendant subsequently fled on foot into a nearby lake, where he had a standoff with police. He was eventually taken into custody and admitted post-*Miranda* to committing the robberies. Defendant consented to a search of the truck, and an additional $90.00 was recovered. Further, as is discussed [ ] above, four victims of the robberies identified Defendant at trial based on his eyes.

Defendant testified that on the morning of the last robbery, he borrowed his girlfriend's car to work at a day-labor agency, but lent the car to a co-worker named Justin "Down South" when Defendant was not selected to go to a job. Defendant claimed that Justin was the true perpetrator, that he was at his girlfriend's apartment smoking a cigarette when Justin sped into the parking lot, came into the apartment, and threw the money on the floor. Defendant testified that he fled the apartment because he saw police coming and was scared; he denied intentionally ramming the police cruiser and claimed that he was trying to go around the car to get out of their way but that the police officer ran into him, and claimed he ultimately fled into the lake because he did not want the canine police officer to bite him. Defendant denied confessing to the offenses, and claimed that he told law enforcement that Justin "Down South" committed the robberies all along. He admitted to keeping clothes in his girlfriend's car, but denied that the gloves or gun were his. When asked whether he let Justin "Down South" borrow his girlfriend's car for all three robberies, Defendant testified that he did not "remember exact dates." He testified that he is a three-time convicted felon. The officer who interviewed Defendant after he was taken into custody testified that Defendant did not state to him at any point that he loaned his car to someone named Justin "Down South" who worked at Able Body Temp, or that he was smoking a cigarette when Justin ran up and threw a pile of money into the apartment, and that law enforcement would have followed up on that information if it had been provided.

In light of the overwhelming evidence against Defendant that was introduced at trial, the court finds that there is no reasonable probability that counsel's failure to object to Detective Anderson's trial testimony regarding a bystander's tip that the suspect switched vehicles at the apartment complex affected the outcome of the trial. Each robbery was recorded on video surveillance and played for the jury — the same modus

operandi and the same gold [or] tan Honda with a dented
bumper was used during each robbery, which indicates that
they were committed by the same person. The victims of the
robberies identified Defendant by his unique "slanted" eyes at
trial. Further, the police tracked the stolen money via GPS
tracker in real time, which led them directly to Defendant's
girlfriend's apartment, where they found the gold [or] tan
Honda that was still hot from the police pursuit and was
registered to Defendant's girlfriend. Police recovered $3,145.00
from the apartment, and clothing, gloves, guns, and more
money from the car; it was undisputed that Defendant had
access to his girlfriend's car and apartment, and borrowed her
car that day. Defendant matches the description of the suspect
police were searching for and was located on the property they
tracked the GPS to, and when confronted, Defendant rammed
his truck into the police vehicle in an attempt to flee before
fleeing on foot into a lake. Defendant admitted to the offenses
when brought back to the police station, and although he
denied the admissions at trial, the jury was tasked with
weighing the credibility of Defendant's story against the
evidence that was introduced. Considering the foregoing, there
is no reasonable probability that the outcome of the trial would
have been different if counsel had objected or moved for a
mistrial. This claim is denied.

At trial, Detective Anderson testified that after the third robbery he learned

that the suspect drove with the tracking device to an apartment complex and that the

suspect abandoned the gold Honda Accord for a Dodge pickup truck (Doc. 19-3

at 906–08):

|  |  |
|---|---|
| [Prosecutor:] | What was your role that day? |
| [Detective:] | Well, when the call came out, we immediately got information that the tracking unit that was used by them had begun to track a vehicle that left with the money, or at least the suspect was in it. We began moving towards the area where the vehicle was tracked to, and then as information was developed as the car was moving, I immediately moved to the area where I knew that car was heading towards. |

. . .

| | |
|---|---|
| [Prosecutor:] | All right. Where did you ultimately end up at? |
| [Detective:] | 62nd Avenue South and 22nd Street South. |
| [Prosecutor:] | And what's in that area? |
| [Detective:] | Apartment complex. It was called Lynn Lake Arms Apartments. I was basically just on the perimeter of that apartment building on 22nd Street because the last information I had was the car was heading southbound on 22nd Street. |
| [Prosecutor:] | All right. And what type of vehicle were you looking for? |
| [Detective:] | I was looking for a four-door gold or light colored Honda Accord. |
| [Prosecutor:] | Okay. Eventually, did you receive information that [the] vehicle had [ ] now changed to a different vehicle? |
| [Detective:] | Yes. |
| [Prosecutor:] | All right. And the suspect had moved from one [vehicle] to a second vehicle? |
| [Detective:] | That's correct. |
| [Prosecutor:] | And that vehicle was a Dodge pickup truck? |
| [Detective:] | Yes. |

On cross-examination, Detective Anderson further testified that he learned that the suspect arrived at the apartment complex in the Honda Accord, parked in front of an apartment, went inside the apartment, and left in the Dodge truck (Doc. 19-3 at 922–23):

| [Trial counsel:] | Okay. So, when you're at the Lynn Lake Apartments, it's my understanding you received information that the suspect had gotten into a Dodge Ram? |
|---|---|
| [Detective:] | Yes. |
| [Trial counsel:] | Okay. The information you received was that the suspect had gotten out of the gold Honda Accord and went immediately into the Dodge Ram truck, correct? |
| [Detective:] | Not immediately, no. |
| [Trial counsel:] | Okay. So, what was the information you received? |
| [Detective:] | The information I received was that a gold Honda Accord came into the apartment complex traveling over one hundred miles an hour, parking in front of 6016, Apartment A, in front of the building, went inside the building, immediately came back out, got inside the green Dodge Ram Charger truck, and headed towards the front gate. |

On redirect examination, Detective Anderson testified that he learned about the Dodge truck from an operator on his radio (Docs. 19-3 at 928 and 29 at 2):

| [Prosecutor:] | Initially, when you get involved, you were receiving multiple updates over your radio? |
|---|---|
| [Detective:] | Yes. |
| [Prosecutor:] | These are the same updates that go to all the officers that are within that area that could assist? |
| [Detective:] | Yes. |
| [Prosecutor:] | And you did what you — you did — you made your own decisions with the information that you received? |

| | |
|---|---|
| [Detective:] | Absolutely. |
| [Prosecutor:] | Okay. Just like any other officer makes his own decisions of what he wants to do with that information? |
| [Detective:] | Yes. |
| [Prosecutor:] | The information that you received in regards to the fact that an individual had just driven up in a gold Honda at one hundred miles an hour, went to the apartment, came back out, got into the Dodge, that was all provided by the same person? |
| [Detective:] | Yes, it was. |
| [Prosecutor:] | You were actually provided detailed information in regards to that, is that correct? |
| [Detective:] | Yes, I was. |
| [Prosecutor:] | Even names? |
| [Detective:] | Yes. |
| [Prosecutor:] | The name Robert Keaton? |
| [Detective:] | Yes. |
| [Prosecutor:] | As the individual that left that gold Honda, into the home, back out into the Dodge pickup? |
| [Detective:] | I was. |

On recross examination, Detective Anderson testified that, because the person who identified Keaton was a confidential informant, the detective omitted from his report the identification (Doc. 29 at 3):

| | |
|---|---|
| [Trial counsel:] | You didn't think that was important to put in your police report that you were given the specific name of Robert Keaton? |

| [Detective:] | Because I couldn't put the person who provided me [the] name in the report. |
| [Trial counsel:] | But, again, but you still mentioned that you received information from a person? |
| [Detective:] | Yes. |
| [Trial counsel:] | You just didn't think it was necessary to put in that report the specific information you received? |
| [Detective:] | I couldn't put it in there because of the person that provided it to me. |
| [Trial counsel:] | Why? |
| [Detective:] | Because he is a confidential informant. |

Also, during further examination by the prosecutor, Detective Anderson

explained that the confidential informant reported Keaton's arrival and departure to

the detective while observing the arrival and the departure (Doc. 29 at 6):

| [Prosecutor:] | What is a confidential informant? |
| [Detective:] | A confidential informant is someone that for lack of better term works for the police department. This particular individual's known me since I've been a police officer, has always provided me with accurate information pertaining to crimes that he has witnessed [or] received information on. |
| | On that date, he witnessed this event and called me on the phone. While talking to me on the phone, he told me that the car came into the apartment complex. The gentleman later identified as Mr. Keaton went inside the building. He hung up with me. Moments later, as I gave that information out that the car was parked, he calls me back and says that he had just gotten inside a green Dodge truck and was |

> heading towards the gate, and I relayed
> that information over the radio to the unit
> at the front of the complex.

Detective Anderson denied that the confidential informant requested a recommendation of leniency in a criminal case for his assistance with the investigation.  (Doc. 29 at 7–8)

Detective Crews testified that, just after the third robbery, his supervisor told him the location of the tracking device.  (Doc. 19-3 at 1068–69)  He testified that he learned that the suspect traveled with the tracking device to an apartment and abandoned his car for a truck (Doc. 19-3 at 1069–70):

> [Detective:]  Information immediately came out that
> the person that was driving the car is now
> getting into a truck, a pickup truck,
> a green pickup truck. At this point, I'm
> still east of the complex outside of the
> complex. I was able to see the green truck
> traveling northbound inside the apartment
> complex. Again, prior to being able to
> give that information on the air, another
> unit came over the air and indicated he
> [had] seen the truck. The truck is now
> heading towards the exit of the apartment
> complex.

Because the confidential informant spoke to Detective Anderson while observing Keaton's arrival and departure (Doc. 29 at 6), the confidential informant's statements were admissible as spontaneous statements.  § 90.803(1), Fla. Stat. *Ruff v. State*, 115 So. 3d 1023, 1025 (Fla. 4th DCA 2013) ("'A spontaneous statement must be made at the time of, or immediately following, the declarant's observation of the event or condition described . . . . [T]he statement must be made without the declarant first engaging in reflective thought.'") (citation omitted).  *See also Deparvine*

*v. State*, 995 So. 2d 351, 369 (Fla. 2008) ("[B]ecause we now conclude that this view requiring a startling event in order for the spontaneous exception to apply is contrary to the underlying principles embodied in Section 90.803(1), we now reject this view.").

Because the confidential informant told Detective Anderson that Keaton abandoned the Honda Accord for the Dodge truck while police pursued a suspect who just robbed the pawn shop with a gun, hit an employee of the pawn shop on the head with the gun, threatened to kill the employee, and fled in the Honda Accord (Doc. 19-3 at 737–51), the confidential informant's statements were not testimonial. *Davis v. Washington*, 547 U.S. 813, 822 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."); *Michigan v. Bryant*, 562 U.S. 344, 361 (2011) ("The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' Rather, it focuses them on 'end[ing] a threatening situation.'") (quoting *Davis*, 547 U.S. at 822, 832).  Because admission of the statements did not violate Keaton's federal right to

confrontation, neither an objection nor a motion for mistrial would succeed.

Consequently, trial counsel did not deficiently perform. *Pinkney*, 876 F.3d at 1295.

Even if an objection to the admission of the confidential informant's statements succeeded, Keaton cannot demonstrate a reasonable probability that the outcome at trial would change. *Strickland*, 466 U.S. at 694. The employees identified Keaton as the suspect because Keaton's height, weight, and eyes matched the suspect's height, weight, and "droopy" eyes. (Doc. 19-3 at 752–53, 764, 793–94, 809) A police officer determined after the third robbery that the suspect drove with the tracking device to an apartment complex. (Doc. 19-3 at 866–67) The officer observed the gold Honda Accord with the dent in the rear bumper parked in front of an apartment, found a bag of black clothes, a revolver, and ammunition inside the car, and found the tracking device and a pile of money on the floor inside the apartment. (Doc. 19-3 at 189–94, 204–33, 867, 883–93 and 29 at 21–26)

The gold Honda Accord and the apartment belonged to Keaton's girlfriend. (Doc. 19-3 at 909–14, 1173) On the day of the third robbery, Keaton's girlfriend lent the car to Keaton. (Doc. 19-3 at 1174) When police arrived at the apartment complex and blocked the exit, Keaton deliberately drove his truck into a police car blocking the exit. (Doc. 19-3 at 949–51 and 29 at 60–64) Keaton attempted to flee from police by swimming into a lake. (Doc. 19-3 at 951, 956–59) After waiving his *Miranda* rights, Keaton confessed that he committed the three robberies. (Doc. 19-3 at 990–92)

Only self-serving testimony by Keaton, a three-time convicted felon (Doc. 19-3 at 1211), supported the claim that a male named Justin committed the crimes. Keaton's flight immediately after police discovered the gold Honda Accord at his girlfriend's apartment demonstrated consciousness of guilt. *Cruz*, 320 So. 3d at 714. Even without admission of the statements by the confidential informant, strong circumstantial evidence proved that, on the day of the third robbery, Keaton borrowed the Honda Accord from his girlfriend, returned to her apartment with the tracking device hidden in the stack of money, threw the money on the floor of the apartment, and attempted to flee in the Dodge truck when police arrived.

Because Keaton failed to demonstrate a reasonable probability that the outcome at trial would change, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694. *Johnson v. Sec'y, Dep't Corrs.*, 737 F. App'x 438, 441–42 (11th Cir. 2018) ("It is true that Officer Reed's testimony that an anonymous witness described one of the burglars as a twenty to twenty-five-year-old black male was the only direct evidence that Johnson committed the burglary. But, as noted by the state court, the State presented significant circumstantial evidence of Johnson's guilt."). Ground five is denied.

**Ground Six:**

Keaton asserts that trial counsel deficiently performed by neither requesting a curative instruction nor moving for a mistrial during both the cross-examination of Keaton and closing argument when the prosecutor allegedly shifted the burden of

proof.  (Doc. 8 at 32–36)  The post-conviction court denied the claim as follows (Doc. 19-4 at 735–40) (state court record citations omitted and italics in original):

> Defendant[ ] alleges that counsel was ineffective for failing to request a curative instruction or mistrial when the State impermissibly shifted the burden of proof during the cross-examination of Defendant. Defendant cites to pages 1080 to 1085 of the transcript, and appears to refer to the following exchange when the State was cross-examining him regarding his testimony that he lent his girlfriend's car to a co-worker named Justin, who he claimed committed the robberies:

> | [Prosecutor:] | You didn't subpoena any records, you know, from that business, did you? |
> |---|---|
> | [Keaton:] | No, I didn't. I was *pro se* at the time. |
> | [Prosecutor:] | Yeah, you were *pro se* at the time. You were representing yourself. You knew how to get documents from the Pinellas County DNA lab. You knew how to get documents from the St. Petersburg Police Department on your own. You knew how to file documents to get additional discovery from me here in this courtroom. And you didn't even ask the court to subpoena the records from that business, did you? |
> | [Trial counsel:] | Your Honor, I'm going to object. May we approach? |
> | [Trial court:] | Approach. |

> (Whereupon a sidebar conference was held outside the hearing of the jury as follows:)

> | [Trial counsel:] | I think this line of questioning is going towards him having to prove something. It's the State's burden to prove that he did it, not that he's innocent. It's not his job to prove he's innocent. |
> |---|---|
> | [Trial court:] | Okay. Response? |

| [Prosecutor:] | Judge, I think it's fair inquiry if there is information available to him and he has resources to get them and he chose not to do it. |
|---|---|
| [Trial court:] | Okay. I'm going to have you move on. Thank you. |

(Whereupon proceedings resumed in open court:)

. . .

| [Prosecutor:] | And you never said, Mr. Ripplinger, would you subpoena — |
|---|---|
| [Trial counsel:] | Objection, Your Honor. |
| [Trial court:] | I said move on. |

Defendant alleges that after the court sustained counsel's objection, counsel was ineffective for failing to request a curative instruction or move for a mistrial, which prejudiced him because the improper burden shifting undermined the credibility of his testimony by suggesting to the jury that he had a duty to present additional evidence and failed to do so, causing the jury to wrongfully convict him on all charges under the belief that he was guilty of all crimes charged because he did not present additional evidence. Defendant alleges that his testimony was his sole defense, and but for counsel's deficiency, the jury would not have considered Defendant guilty as charged for not presenting additional evidence. The State was directed to respond.

In its response, regarding the curative instruction, the State argues that Defendant cannot establish that the outcome of the trial would have been different even if the court granted a request from counsel to remind the jury that it was the State's burden to prove the offense. The State argues that the jury was instructed on the burden of proof and the presumption of innocence several times during the course of the trial and argues that "[t]he law presumes that the jury has followed all of the court's instructions, in the absence of evidence to the contrary." *Garzon v. State*, 939 So. 2d 278, 285 (Fla. 4th DCA 2006). The State avers that it did not ask any further questions on the topic, nor did it argue in closing that Defendant failed to obtain any evidence. The State argues that its comments in closing relating to the viability of Defendant's argument that

the police fabricated his confession and failed to follow up on Justin "Down South" were in direct response to counsel's closing argument, and focused on law enforcement's failure to investigate, not Defendant's, which is permissible. The State argues that Defendant's claim that his brief exchange with the State ultimately led the jury to disregard the court's instructions is speculative and insufficient to warrant post-conviction relief. The State further argues that, considering the "wealth of inculpatory evidence introduced at trial" and summarized in the previous claim, there is no reasonable probability that the outcome of the trial would have been different if the jury had been reminded of the State's burden.

Further, regarding the request for a mistrial, the State argues that Defendant fails to establish that he would have been entitled to a mistrial, which is an extraordinary remedy. The State further argues that an improper burden-shifting comment is not an error that *per se* affects the outcome of a trial. *See Lenz v. State*, 245 So. 3d 795, 797–98 (Fla. 4th DCA 2018). The State argues that [neither] Defendant's *pro se* status, nor his ability to investigate his defense were raised at any other point during the trial, and any error in the State's line of questioning was not so prejudicial that it deprived Defendant of a fair trial. The State therefore avers that, even if counsel had moved for a mistrial, there is no reasonable probability that a mistrial would have been granted. *See Dunlap v. State*, 21 So. 3d 873, 877 (Fla. 4th DCA 2009).

The court finds the State's response persuasive, and agrees that Defendant is not entitled to relief on this claim. Generally, it is improper for the State to elicit testimony or comment on a defendant's failure to produce evidence of their innocence, with a narrow exception allowing the State to comment where the defendant voluntarily assumes some burden of proof. *See Jackson v. State*, 575 So. 2d 181, 188 (Fla. 1991); *Warmington v. State*, 149 So. 3d 648, 659 (Fla. 2014); *Miele v. State*, 875 So. 2d 812, 814 (Fla. 2d DCA 2004) ("The only exception to this rule applies when the defendant assumes some burden of proof by offering an affirmative defense and the witness is not equally available to the State."). If improper testimony or argument is made at trial, the court has the discretion whether to offer a curative instruction to the jury. *See Salazar v. State*, 991 So. 2d 364, 372 (Fla. 2008). A mistrial is "a drastic remedy." *Jones v. State*, 128 So. 3d 199, 200 (Fla. 1st DCA 2013). "The granting of a motion for mistrial is not based on whether an error is prejudicial." *Guzman v. State*, 214 So. 3d 625, 632 (Fla. 2017) (quoting *Scott v. State*, 66 So. 3d 923, 931 (Fla. 2011)) (internal

quotations omitted). Instead, a motion for mistrial should only be granted "when the error is so prejudicial as to vitiate the entire trial, such that a mistrial is necessary to ensure that the defendant receives a fair trial." *Id.* (quoting *Gosciminski v. State*, 132 So. 3d 678, 695–96 (Fla. 2013)) (internal quotations omitted). Counsel can be ineffective for failing to request a curative instruction or move for a mistrial. *See King v. State*, 230 So. 3d 179, 180 (Fla. 5th DCA 2017) (citing *Stites v. State*, 841 So. 2d 681, 681 (Fla. 5th DCA 2003)); *Harvin v. State*, 886 So. 2d 1041, 1042 (Fla. 1st DCA 2004). However, even if counsel was deficient, the defendant still must establish a reasonable probability that the error affected the outcome of the trial. *See Washington v. State*, 705 So. 2d 132, 133 (Fla. 4th DCA 1998).

Here, Defendant fails to demonstrate a reasonable probability that the outcome of the trial would have been different if counsel had requested a curative instruction to "instruct the jury that the Defendant does not have a burden of proof to present additional evidence . . . ." First, the comments that Defendant alleges constitutes burden-shifting were brief, immediately objected to, and the State was instructed to move on. The State asked no further questions on the topic, and did not argue at closing that Defendant failed to obtain any evidence.[4] The court instructed the jury on the burden of proof and presumption of innocence several times during Defendant's trial; at one point clarifying that "it is the prosecution that has the exclusive burden of proof. By inserting that word 'exclusive,' this is what I mean: *The burden of proof never shifts over to the Defense. The burden of proof is with the prosecution. There's no burden of proof at the defense table.*" Further, during closing arguments, both the State and defense highlighted to the jury that it was the State's burden to prove Defendant's guilt[ ] beyond a reasonable doubt. Moreover, the jury was provided a copy of the jury instructions for deliberations; each of the eleven offenses (and their lesser included offenses) provide that "the State must prove" the elements of the offenses beyond a reasonable doubt. "The law presumes that the jury has followed all of the court's instructions, in the absence of evidence to the contrary." *Garzon v. State*, 939 So. 2d 278, 285 (Fla. 4th DCA 2006). Considering the brief nature of the exchange and the fact that the jury was continually instructed on the State's burden of proof throughout the proceedings, Defendant's claim that the brief exchange caused the jury to disregard the court's instructions is speculative and insufficient to warrant post-conviction relief. Moreover, considering the overwhelming evidence implicating

Defendant in this case, which is summarized [ ] above, there is no reasonable probability that the outcome of the trial would have been different if the court had again instructed the jury on the State's burden.

> [4] As the State points out in its response, the State commented on the viability of Defendant's argument that the police fabricated his confession and failed to follow up on Justin; however, those comments were made in response to counsel's closing argument and focused on the police's alleged failure to investigate, not Defendant's. Responsive arguments to a theory of defense does not constitute improper burden shifting. *See Bell v. State*, 108 So. 3d 639, 648 (Fla. 2013); *Rivera v. State*, 840 So. 2d 284, 287 (Fla. 5th DCA 2003); *Ealy v. State*, 915 So. 2d 1288, 1291 (Fla. 2d DCA 2005).

Likewise, regarding Defendant's claim that counsel as ineffective for failing to move for a mistrial, Defendant fails to establish that he would have been entitled to such drastic remedy. An improper burden shifting comment is not an error that per se affects the outcome of a trial. *See Lenz v. State*, 245 So. 3d 795, 798 (Fla. 4th DCA 2018) ("A burden shifting comment is reviewed for harmless error.") (citing *Paul v. State*, 980 So. 2d 1282, 1283 (Fla. 4th DCA 2008)). The State's comment was brief, and the State did not reference Defendant's *pro se* status, nor his ability to investigate or lack of investigation of his defense at any other point during the trial. Further, as is summarized [above], there was a wealth of inculpatory evidence introduced at trial. Therefore, even if counsel had moved for a mistrial, there is no reasonable probability that it would have been granted under the circumstances of this case. *See Dunlap v. State*, 21 So. 3d 873, 874 (Fla. 4th DCA 2009) (mistrial not warranted where prosecutor's alleged burden shifting comments were brief, and the trial court properly instructed the jury on the burden of proof); *see also Paul*, 980 So. 2d at 1283 (finding that the prosecutor's comment during closing argument, which improperly shifted the burden of proof to defendant by insinuating that defendant needed to prove that the prosecutor's only witness was lying in order to be found not guilty, was reversible error, where *the sole evidence presented against defendant was the witness*) (citing *Atkins v. State*, 878 So. 2d 460 (Fla. 3d DCA 2004) (comment about the defendant's failure to show victim was lying was not harmless where *the sole evidence against the defendant was the victim's*

*identification*)) (emphasis added). Counsel was not deficient for
failing to make a meritless motion. *See Ferrell*, 29 So. 3d at 959.
This claim is denied.

Whether an objection or a motion for mistrial would succeed is an issue of

state law, and a state court's determination of state law receives deference in federal

court. *Pinkney*, 876 F.3d at 1295.  The prosecutor's questions were brief and isolated,

and during closing the prosecutor did not argue that Keaton failed to prove his

innocence and instead explained why police were unable to investigate Keaton's

claim that a male named Justin committed the robberies.  (Doc. 19-3 at 1238–40,

1312–13)  Also, during closing, the prosecutor and trial counsel reminded the jury of

the prosecutor's burden of proof.  (Doc. 19-3 at 1270, 1284, 1309–10)  Before trial

and after closing, the trial judge instructed the jury on the prosecutor's burden of

proof.  (Doc. 19-3 at 502–06, 1415–16)  Before deliberations, the trial judge gave to

the jurors a written copy of the jury instructions.  (Doc. 19-3 at 1429)  "'[It is] the

almost invariable assumption of the law that jurors follow their instructions.'"

*Olano*, 507 U.S. at 740 (citation omitted).

"A mistrial is appropriate only when the error committed was so prejudicial as

to vitiate the entire trial." *Williams v. State*, 754 So. 2d 724, 726 (Fla. 4th DCA 1999).

"[W]hen the trial court, immediately following the state's improper comment, gives

a curative instruction, any question of an improper taint on the jury's understanding

of the burden of proof is removed." *Williams*, 754 So. 2d at 726.  If trial counsel

moved for a mistrial after the comments during either cross-examination or closing,

the trial judge would deny the motion and remind the jury of the prosecutor's burden

of proof.  *Williams*, 754 So. 2d at 726.  *Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").

Lastly, compelling evidence proved Keaton's guilt.  The employees identified Keaton as the suspect because Keaton had the same height, weight, and "droopy" eyes as the masked male.  (Doc. 19-3 at 752–53, 764, 793–94, 809)  A police officer determined after the third robbery that the suspect drove with a tracking device hidden in a stack of money to an apartment complex.  (Doc. 19-3 at 866–67)  The officer observed in front of an apartment the gold Honda Accord driven away by the suspect after the robbery, found a bag of black clothes, a revolver, and ammunition inside the car, and found the tracking device and a pile of money on the floor inside the apartment.  (Doc. 19-3 at 189–94, 204–33, 867, 883–93 and 29 at 21–26)

The gold Honda Accord and the apartment belonged to Keaton's girlfriend. (Doc. 19-3 at 909–14, 1173)  On the day of the third robbery, Keaton's girlfriend lent the car to Keaton.  (Doc. 19-3 at 1174)  When police arrived at the apartment complex, Keaton deliberately drove his truck into a police car that blocked the exit. (Doc. 19-3 at 949–51 and 29 at 60–64)  Keaton attempted to flee from police by swimming into a lake.  (Doc. 19-3 at 951, 956–59)  After waiving his *Miranda* rights, Keaton confessed that he committed the three robberies.  (Doc. 19-3 at 990–92)

Only self-serving testimony by Keaton, a three-time convicted felon (Doc. 19-3 at 1211), supported the claim that a male named Justin committed the crimes. Keaton could not remember whether on the day of the first and second robberies he

lent his girlfriend's car to Justin.  (Doc. 19-3 at 1240)  Keaton's flight immediately after police discovered the gold Honda Accord at his girlfriend's apartment demonstrated consciousness of guilt.  *Cruz*, 320 So. 3d at 714.  Because Keaton cannot demonstrate a reasonable probability that the outcome at trial would change if the trial judge had given the jury a curative instruction, the post-conviction court did not unreasonably deny the claim.  *Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").  Ground six is denied.

### Ground Seven:

Keaton asserts that trial counsel deficiently performed by not objecting when the prosecutor violated a pretrial ruling requiring the prosecutor to request a sidebar conference before asking a witness to identify Keaton as the suspect ("sub-claim A"), by not adequately cross-examining each witness about his or her identification of Keaton as the suspect ("sub-claim B"), and by not objecting to the prosecutor's use of an unduly suggestive identification procedure.  ("sub-claim C")  (Doc. 8 at 40–49)

**Sub-claim A**

Keaton asserts that trial counsel deficiently performed by not objecting when the prosecutor violated a pretrial ruling requiring the prosecutor to request a sidebar conference before asking a witness to identify Keaton as the suspect.  (Doc. 8 at 41–42)  The post-conviction court denied the claim as follows (Doc. 19-4 at 191–93) (state court record citations omitted):

Defendant[ ] alleges that counsel was ineffective for failing to object and move for a mistrial when the State violated the court's order in limine prohibiting the State from asking any of the robbery victims if they were able to make a courtroom identification. Defendant alleges that the State repeatedly violated the court's order, and counsel failed to object. Defendant appears that to allege that the State violated the order as to all victim witnesses, as he states that he was prejudiced because "identity was a genuinely disputed issue throughout the trial and being positively identified by all victim witnesses, precisely led to an irreparable mistaken identification which caused an unreliable or fundamentally unfair outcome in the proceeding." He further alleges that counsel should have moved for a mistrial, because even if the jury [was] instructed to disregard the inadmissible identification testimony, they would have been unlikely to do so. Defendant alleges that the State would have been precluded from trying Defendant again due to double jeopardy. Defendant asserts that but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different.

Defendant is not entitled to relief. On the morning of trial, counsel filed a motion in limine requesting in relevant part that the State refrain from asking victim witnesses if they can identify the person who committed the offenses in the courtroom. The motion alleged that such testimony would be highly prejudicial and improper because all victim witnesses previously indicated that they could not identify the perpetrator because he was wearing a mask. Prior to the start of the trial, the State conceded that none of the victims had indicated that they could identify the assailant during their depositions but argued that there are photographs that show Defendant's eyes, and the victims were close enough to Defendant that they may recognize him. The State argued that the victims could be cross-examined about their prior statements, and argued that the motion should be denied. The court responded that before a victim was asked to identify Defendant in court, the parties should approach the bench.

Defendant is not entitled to relief because counsel was not deficient. Defendant was charged with robbery as to five victims, each of whom testified at trial: Serina Nero (counts one and three), Mary Johnson (counts six and nine), Michael Bolden (counts two and ten), Melvino Wilson (counts seven and eleven), and Matthew Collins (count eight). With the exception of Mr. Collins, each victim was a victim in two separate robberies committed by Defendant. Each of the

- 52 -

witnesses indicated that, although Defendant was wearing a mask during the first robbery they were victims of, his eyes were distinguishable. Ms. Nero testified that Defendant was within arm's reach of her during the first robbery, and that his eyes "stuck out" because they "go a little bit down." Ms. Johnson testified that she was able to see Defendant's eyes and described that they were brown and "droopy on the sides." Mr. Bolden testified that he was "real close" to Defendant at times during the robbery, and that he noticed that Defendant's eyes stood out because they were "a little slanted," and drooped down. Mr. Wilson testified that Defendant's eyes were slanted and that they were "burned into my soul," and that he would never forget Defendant's eyes.

Ms. Nero, Mr. Bolden, Ms. Johnson, and Mr. Wilson were each re-called later recalled as a witness to testify regarding the second robberies they were victims of. Ms. Nero testified that she recognized that the perpetrator was the same person from the first robbery. The State then asked Ms. Nero if she saw the perpetrator in the courtroom, at which point counsel objected, and a bench conference was held. Counsel argued that Ms. Nero had only identified Defendant's eyes, and the court responded that "that's [going to] be [a] fruitful area for cross-examination," overruling the objection. Therefore, counsel was not deficient for failing to object as to Ms. Nero's identification because counsel did object, and the objection was overruled.

In light of the court's response in overruling counsel's initial objection to Ms. Nero's identification of Defendant based on her earlier testimony distinguishing his eyes, counsel was not deficient for failing to object to the other victim's identification of Defendant. As is recounted above, like Ms. Nero, Mr. Bolden, Ms. Johnson, and Mr. Wilson had also only identified Defendant by his eyes, and indicated that they were identifying Defendant by his eyes during the trial. Therefore, if counsel had objected to Mr. Bolden's, Ms. Johnson's, or Mr. Wilson's identification of Defendant or moved for a mistrial, the objection would have been overruled for the same reason that the objection was overruled as to Ms. Nero's identification, and counsel cannot be deemed ineffective for failing to raise a meritless objection. *Schoenwetter v. State*, 46 So. 3d 535, 546 (Fla. 2010).

Further, Defendant was not prejudiced. First, Defendant was not prejudiced because even if counsel did object, the objection would have been overruled as described above. Second,

counsel was able to use the identifications to Defendant's advantage during her cross-examination of the victims, by calling their memories and identification into question. Counsel pointed out the distance between the witness chair and where Defendant was sitting, the fact that the victims were able to identify Defendant at trial, but did not recognize Defendant when he came into the store to pawn a television after the first two robberies, but before the third robbery, and suggested that the victims were only identifying Defendant as the perpetrator because he was sitting in the defendant's chair at trial. Counsel further made these arguments during her closing argument. In light of the foregoing, Defendant has failed to meet either prong of *Strickland*, and this claim is denied.

The post-conviction court denied a related claim as follows (Doc. 19-4 at 741–42) (state court record citations omitted):

Defendant[ ] alleges that counsel was ineffective for failing to object to and move for a mistrial when the State committed "prosecutorial overreaching" intended to "goad" him into moving for a mistrial. Defendant alleges that prior to trial, the court granted his motion in limine, requiring the State to approach the bench before asking a question about [an] in-court identification of Defendant. Defendant alleges that counsel failed to contemporaneously object (rather than object after) when the State asked Ms. Nero if she was able to identify the perpetrator in the courtroom, and failed to object at all to the in-court identification by the other victim-witnesses. Defendant alleges that up until the trial, he had never been identified as the perpetrator by any victim in a photo pack or lineup, and no victim made a statement related to identifying his eyes. Defendant alleges that counsel failed to object to the State's repeated violation of the motion in limine, and the deficiency allowed the State to try the case with inadmissible, prejudicial evidence. He alleges that the in-court identification caused irreparable mistaken identification that had a perpetual effect on the jury, and also appears to allege that he was prejudiced because if counsel had objected, jeopardy would have attached due to the State's overreaching and he would have been forever discharged from the crime. He therefore argues that but for counsel's error, the outcome of the trial would have been different.

This claim amounts to essentially the same claim that Defendant raised [in an earlier ground], which was denied in this court's July 9, 2018, order. This claim is denied for the

same reason: counsel was not deficient. As is discussed in greater detail in [ ] this court's previous order, prior to trial, counsel filed a motion in limine requesting in that the State refrain from asking victim witnesses if they could identify the person who committed the offenses in the courtroom, because all victim witnesses previously indicated that they could not identify the perpetrator because he was wearing a mask, and such testimony would be highly prejudicial and improper. The court ultimately responded that before a victim was asked to identify Defendant during trial, the parties should approach the bench.

Victim-witnesses Ms. Nero, Mr. Bolden, Ms. Johnson, and Mr. Wilson each testified that, although the perpetrator was wearing a mask during the first robbery they were victims of, his eyes were distinguishable. When Ms. Nero was recalled to testify regarding the second robbery she was a victim of, the State asked if she recognized the perpetrator in the courtroom without approaching the bench, at which point counsel objected, and a bench conference was held. Counsel argued that Ms. Nero had only identified Defendant's eyes, and the court responded that "that's [going to] be fruitful area for cross-examination," overruling the objection. Therefore, counsel was not deficient for failing to object as to Ms. Nero's identification because counsel did object, and the objection was overruled. Further, in light of the court's response in overruling counsel's initial objection to Ms. Nero's identification of Defendant, counsel was not deficient for failing to object to the other victims' identification of Defendant. Like Ms. Nero, Mr. Bolden, Ms. Johnson, and Mr. Wilson had also only identified Defendant by his eyes, and indicated that they were identifying Defendant by his eyes during the trial.

Therefore, if counsel had objected to Mr. Bolden, Ms. Johnson, or Mr. Wilson's identification of Defendant or moved for a mistrial, the[n] it would have been denied for the same reason it was denied as to Ms. Nero's identification, and counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Schoenwetter v. State*, 46 So. 3d 535, 546 (Fla. 2010).

Likewise, Defendant was not prejudiced, because counsel did object and the objection was overruled. Instead, counsel attempted to use the identifications to Defendant's advantage during her cross-examination of the victims and her closing argument, by calling [into doubt] their memories and identification, and therefore their credibility, into question.

In light of the foregoing, Defendant has failed to meet either prong of *Strickland*, and this claim is denied.

Whether an objection or a motion for mistrial would succeed is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney*, 876 F.3d at 1295.

Before trial, trial counsel moved to exclude testimony by any witness identifying Keaton as the suspect because no witness identified Keaton as the suspect, and the trial judge ruled on the motion as follows (Doc. 19-3 at 266–68):

[Trial counsel:]   Okay. We also — obviously, the State is [prohibited] from asking the victim witnesses if they can identify my client in court here today. None of them indicated in their interviews with the police, the depositions, that they could ever identify the defendant specifically because the person was wearing a mask. So, we would ask the State to refrain from that. It's highly prejudicial and improper.

[Trial court:]   Okay.

[Trial counsel:]   And I don't believe any of them were even —

[Trial court:]   Identification of the face, right?

[Trial counsel:]   Correct.

[Prosecutor:]   Judge —

[Trial court:]   Okay. Response.

[Prosecutor:]   — it is possible that some of the witnesses may or may not be able to, you know, recognize the defendant. There was, you know, photographs [that] do show, you know, his eyes and stuff, you know, pretty clearly, and they were, you know, close

|  | enough, and it is possible that they may recognize him. |
|--|--|
|  | If they've made some type of statement like that, I don't have any specifics here being pointed out as to any particular one, they could certainly be cross-examined about that prior statement. So, I believe the motion should be, you know, denied. |
| [Trial court:] | Do any of the depositions reveal that any of the victims could identify the assailant? |
| [Prosecutor:] | Nobody positively said that they could. |
| [Trial court:] | Okay. All right. So, it would appear to me, then, that before you ask that question, you would approach the bench because I don't want to cause a mistrial. Okay? |

The information charged Keaton with robbing employees of the pawn shop, including Serina Nero during the first and third robberies (count one and count three), Michael Bolden during the second and third robberies (count two and count ten), Mary Johnson during the first and third robberies (count six and count nine), Melvino Wilson during the second and third robberies (count seven and count eleven), and Matthew Collins during the second robbery (count eight). (Doc. 19-2 at 166–70)

The prosecutor called Nero and Johnson to testify about the first robbery. Nero testified that the suspect's eyes "stuck out to [her]" because his eyes "kind of like [went] a little bit down, a little bit." (Doc. 19-3 at 564, 571) Johnson testified that, even though a shirt covered the suspect's mouth and head, Johnson saw the

suspect's eyes, which appeared "brown and [a] little droopy on the sides."
(Doc. 19-3 at 596)

The prosecutor called Bolden, Wilson, and Collins to testify about the second robbery.  Bolden testified that he saw the suspect's eyes, which appeared "a little slanted."  (Doc. 19-3 at 637, 640, 658, 661–62)  Wilson testified that he would not forget the suspect's eyes, which appeared "kind of like slanted in a way" and "weird [and] funny."  (Doc. 19-3 at 670)  Wilson identified the suspect's eyes in a photograph from a surveillance camera.  (Doc. 19-3 at 673–74)  Collins testified that he could not observe "much of [the suspect's] face except, you know maybe a little bit of the eye area maybe."  (Doc. 19-3 at 690)  Collins deliberately did not look at the suspect's eyes.  (Doc. 19-3 at 690–92)

The prosecutor recalled Nero, Bolden, Johnson, and Wilson to testify about the third robbery.  Nero opined that during the first and third robberies the same person robbed the pawn shop.  (Doc. 19-3 at 737–38)  Nero testified that the suspect's voice, clothing, and demands were the same.  (Doc. 19-3 at 737–38)  Also, the trial judge overruled trial counsel's objection to Nero's identification of Keaton as the suspect (Doc. 19-3 at 752–53):

| | |
|---|---|
| [Prosecutor:] | Ma'am, as you experienced the incident on February 25, 2010, you know, at the time and now, did you believe it was the same individual on both — |
| [Nero:] | Yes. |
| [Prosecutor:] | — situations? |
| [Nero:] | Yes. |

| | |
|---|---|
| [Prosecutor:] | Do you see that person in the courtroom today? |
| [Nero:] | Yes. |
| [Prosecutor:] | Could you point to where he's at? |
| [Nero:] | He's over there. |
| [Prosecutor:] | And what is he wearing today? |
| [Nero:] | A suit. |
| [Prosecutor:] | The person you just pointed to? |
| [Nero:] | Yes. He's right over there. |
| [Trial counsel:] | Objection, Your Honor. |
| [Trial court:] | You want to approach the bench? |
| [Trial counsel:] | Yes. |
| | . . . |
| [Trial counsel:] | He's only — she's only ever identified his eyes. |
| [Trial court:] | Okay. |
| [Trial counsel:] | So, I don't see how — |
| [Trial court:] | That's [going to] be [a] fruitful area for cross-examination. |
| [Trial counsel:] | Okay. |
| | . . . |
| [Prosecutor:] | Ma'am, how is it that you're able to — Your Honor, let the record reflect that the witness has identified the defendant in this case, Robert Keaton. |
| [Trial court:] | Noted. |

| [Prosecutor:] | Ma'am, how is it, given the disguise that he was wearing, that you're able to say that's him today? |
|---|---|
| [Nero:] | I'm basing it on his eyes, and each time that we were robbed, that's what I looked at. |
| [Prosecutor:] | And you've been here two occasions today. So, you had opportunities to look at him? |
| [Nero:] | Yes. |

Because trial counsel objected to Nero's identification of Keaton, trial counsel did not deficiently perform during Nero's testimony. Also, Bolden, Johnson, and Wilson testified that Keaton's eyes matched the suspect's eyes. (Doc. 19-3 at 764, 793–94, 809) Because the trial judge overruled trial counsel's objection to the identification by Nero based on Keaton's eyes, Keaton failed to demonstrate that the trial judge would sustain an objection to the same testimony by Bolden, Johnson, and Wilson. Consequently, trial counsel did not deficiently perform during Bolden's, Johnson's, and Wilson's testimony. *Pinkney*, 876 F.3d at 1297.

Even if an objection would succeed, Keaton cannot demonstrate a reasonable probability that the outcome at trial would change. *Strickland*, 466 U.S. at 694. The prosecutor introduced into evidence photographs from a surveillance camera that depicted the suspect's eyes during the second and third robberies. (Doc. 19-3 at 92–93, 98–99, 149) During trial, the jury could observe Keaton's eyes and independently determine whether Keaton's eyes matched the suspect's eyes.

Also, on cross-examination, trial counsel thoroughly impeached each witness on their ability to accurately observe the suspect's eyes. Trial counsel demonstrated

that fifty or sixty feet separated Nero from the suspect when Nero observed the suspect's eyes (Doc. 19-3 at 756), that Bolden told a police officer just after the third robbery that he could not identify the suspect because a "black rag" covered the suspect's face (Doc. 19-3 at 771, 773), and that after the first robbery Johnson did not identify Keaton as the suspect when he brought a television into the pawn shop and presented his identification.  (Doc. 19-3 at 798–802)  During cross-examination of a police officer, trial counsel demonstrated that during an interview Bolden failed to mention that the suspect's eyes looked unusual.  (Doc. 19-3 at 827)  Also, during cross-examination of a detective, trial counsel demonstrated that during an interview Nero and Johnson failed to mention that the suspect's eyes looked unusual. (Doc. 19-3 at 999)

Because the witnesses' ability to accurately observe the suspect's eyes became a "fruitful area for cross-examination" (Doc. 19-3 at 753), Keaton failed to demonstrate that no reasonable counsel would have withheld an objection to the identification testimony by Bolden, Johnson, and Wilson.  Consequently, the post-conviction court did not unreasonably deny the claim.  *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").  Sub-claim A is denied.

**Sub-claim B and Sub-claim C**

In sub-claim B, Keaton asserts that trial counsel deficiently performed by not adequately cross-examining each witness about his or her identification of Keaton as the suspect.  In sub-claim C, Keaton asserts that trial counsel deficiently performed by not objecting to the prosecutor's use of an unduly suggestive identification procedure.  (Doc. 8 at 42–49)

In his federal application, Keaton contends that he raised these sub-claims in claim three, claim seven, and claim eighteen of his post-conviction motion. (Doc. 8 at 40)  The Respondent admits that the sub-claims are exhausted.  (Doc. 19 at 43–54)  However, in claim three and claim eighteen, Keaton asserted that trial counsel deficiently performed by neither objecting nor moving for a mistrial when the prosecutor violated the pretrial ruling requiring the prosecutor to request a sidebar conference before asking a witness to identify Keaton as the suspect. (Doc. 19-4 at 149–50, 162–64, 400–02)  In claim seven, Keaton asserted that the prosecutor violated *Giglio v. United States*, 405 U.S. 150 (1972), by presenting allegedly false testimony by each witness who identified Keaton as the suspect. (Doc. 19-4 at 170)

In his post-conviction motion, Keaton did not assert sub-claim B and sub-claim C.  (Doc. 19-4 at 149–50, 162–64)  In his federal application, Keaton does not assert a *Giglio* claim.  (Docs. 8 at 40–49 and 9 at 35–38)  Because the Respondent waived a defense of exhaustion, review of sub-claim B and sub-claim C is *de novo*. *Vazquez v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 964, 967–68 (11th Cir. 2016).

### Sub-claim B

Keaton asserts that trial counsel deficiently performed by not impeaching Nero with her failure to identify Keaton as the suspect in a statement to police or during her deposition before trial.  (Doc. 8 at 43)  Because Keaton fails to support his claim with a sworn statement or deposition testimony and instead speculates that Nero failed to identify Keaton as the suspect before trial (Doc. 8 at 43), his claim fails.  *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985).  Also, during cross-examination of a detective, trial counsel demonstrated that during an interview Nero described the suspect as "a black male [with] a clothing description because not much of his face was visible at that time."  (Doc. 19-3 at 999)  The detective confirmed that Nero failed to mention that the suspect's eyes looked unusual. (Doc. 19-3 at 999)  Consequently, Keaton fails to demonstrate deficient performance under *Strickland*.  *Reaves v. Sec'y, Fla. Dep't Corrs.*, 872 F.3d 1137, 1157 (11th Cir. 2017) ("We have [ ] held that counsel's failure to present cumulative evidence is not ineffective assistance.").

Keaton asserts that trial counsel deficiently performed by not impeaching Bolden with his failure to describe the suspect's eyes in a statement to police as "distinctive slanted eyes."  (Doc. 8 at 44)  Keaton attaches to his federal application a statement by Bolden that describes the suspect as follows (Doc. 12-2 at 155): "He had on all black clothes from head to toe."  Bolden did not describe the suspect's eyes.  (Doc. 12-2 at 155)  During cross-examination of a police officer, trial counsel demonstrated that during an interview Bolden failed to describe the suspect's eyes as

unusual.  (Doc. 19-3 at 827)  Because trial counsel impeached Bolden with his failure to describe the suspect's eyes during his interview with police, trial counsel did not deficiently perform.  Also, during trial, trial counsel attempted to impeach Bolden with his failure to describe the suspect's eyes during a deposition, and the trial judge sustained the prosecutor's objection to the impeachment.  (Doc. 19-3 at 659–61)  Consequently, Keaton fails to demonstrate prejudice.

Keaton asserts that trial counsel deficiently performed by not demonstrating on cross-examination that Johnson viewed a photograph of Keaton on the Pinellas County Sheriff's Office website before identifying Keaton as the suspect at trial.  (Doc. 8 at 45)  Keaton submits a transcript that demonstrates that Johnson testified during a deposition that after Keaton's arrest she viewed a booking photograph of Keaton on the sheriff's website and concluded that she helped Keaton when he brought a television to the pawn shop.  (Doc. 12-2 at 158)  Also, Keaton asserts that trial counsel deficiently performed by not demonstrating on cross-examination that Wilson failed to describe the suspect's eyes in his statement to police.  (Doc. 8 at 46)  Keaton submits a statement by Wilson to police that describes the suspect as follows (Doc. 12-2 at 161):  "Black male about six feet."  Wilson did not describe the suspect's eyes.  (Doc. 12-2 at 161)

Even if trial counsel deficiently performed by not impeaching Johnson, Wilson, and the other witnesses with additional evidence, Keaton cannot demonstrate prejudice under *Strickland*.  Nero, Bolden, Johnson, and Wilson identified Keaton as the suspect because Keaton's eyes matched the suspect's eyes.

(Doc. 19-3 at 752–53, 764, 793–94, 809)  The prosecutor introduced into evidence three photographs from a surveillance camera that depicted the suspect's eyes during the second and third robberies.  (Doc. 19-3 at 92–93, 98–99, 149)  During trial, the jury could observe Keaton's eyes and independently determine whether Keaton's eyes matched the suspect's eyes.

Also, even if additional impeachment would have cast doubt on the identifications by Nero, Bolden, Johnson, and Wilson, other evidence convincingly proved that Keaton borrowed his girlfriend's Honda Accord to rob the pawn shop. After waiving his *Miranda* rights, Keaton confessed that he committed the three robberies.  (Doc. 19-3 at 990–92)  Only self-serving testimony by Keaton, a three-time convicted felon (Doc. 19-3 at 1211), supported the claim that a male named Justin committed the crimes.  Keaton's flight immediately after police discovered the gold Honda Accord at his girlfriend's apartment demonstrated consciousness of guilt.  *Cruz*, 320 So. 3d at 714.  Because strong circumstantial evidence proved Keaton's identity as the suspect, Keaton cannot demonstrate a reasonable probability that the outcome at trial would change with additional impeachment.  *Strickland*, 466 U.S. at 694.  Sub-claim B is denied.

### Sub-claim C

Keaton asserts that trial counsel deficiently performed by not objecting to the prosecutor's use of an unduly suggestive identification procedure.  (Doc. 8 at 42–49) He contends that before trial the prosecutor should have asked each witness to identify Keaton in a photographic lineup.  (Doc. 8 at 47–48)

"'[C]onvictions based on eyewitness identification at trial following a pre-trial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"  *Neil v. Biggers*, 409 U.S. 188, 196–97 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  "An identification infected by improper police influence . . . is not automatically excluded.  Instead, the trial judge must screen the evidence for reliability pre-trial."  *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).

Nero, Bolden, Johnson, and Wilson identified Keaton as the suspect because Keaton's eyes matched the suspect's eyes.  (Doc. 19-3 at 752–53, 764, 793–94, 809)  Also, Nero, Bolden, Johnson, and Wilson testified that Keaton's height and build matched the suspect's height and build.  (Doc. 19-3 at 754, 764, 794, 809)  Not one of the witnesses testified that police showed them a picture of Keaton before trial.  During her deposition, Johnson testified that after Keaton's arrest she viewed his booking photograph on the sheriff's website.  (Doc. 12-2 at 158)

*Perry*, 565 U.S. at 232–33, holds that federal due process bars the admission of an identification tainted only by a police officer's use of an unnecessarily suggestive procedure:

> We have not extended pre-trial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. . . . Our decisions [ ] turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a line-up, show-up, or photograph array.  When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose,

> notably, the presence of counsel at post-indictment lineups,
> vigorous cross-examination, protective rules of evidence, and
> jury instructions on both the fallibility of eyewitness
> identification and the requirement that guilt be proved beyond
> a reasonable doubt.

Because Keaton fails to allege that a police officer used an unnecessarily suggestive procedure when asking a witness to identify Keaton before trial (Doc. 8 at 47–48), an objection would not succeed. Consequently, trial counsel did not deficiently perform. *Pinkney*, 876 F.3d at 1297.

Also, even if trial counsel successfully moved to exclude the identification testimony by the witnesses, the jury could independently determine whether Keaton's eyes matched the suspect's eyes after viewing photographs of the suspect's eyes during the robberies. Also, other evidence convincingly proved that Keaton borrowed his girlfriend's Honda Accord to rob the pawn shop. Consequently, Keaton cannot demonstrate a reasonable probability that the outcome at trial would change if the trial judge excluded the identification testimony. *Strickland*, 466 U.S. at 694. Sub-claim C and ground seven are denied.

**<u>Ground Eight:</u>**

Keaton asserts that cumulative error demonstrates his entitlement to relief. (Doc. 8 at 50) Because no series of errors exists to accumulate, the cumulative-error claim is meritless. *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Ground eight is denied.

## VI.  CONCLUSION

Keaton's amended application for the writ of habeas corpus (Doc. 8) is

**DENIED**.  The clerk must enter a judgment against Keaton and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Keaton fails to demonstrate either a substantial showing of the denial

of a constitutional right or that reasonable jurists would debate either the merits of

the grounds or the procedural issues, a certificate of appealability and leave to appeal

*in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S.

473, 478 (2000).  Keaton must obtain permission from the court of appeals to appeal

*in forma pauperis*.

ORDERED in Tampa, Florida, on September 23, 2024.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE